John Russell THOMPSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 62921.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 23, 1981.

C. N. Rothe, David K. Chapman, San Antonio, for appellant.

Bill M. White, Dist. Atty., and Keith W. Burris, Bill Blagg and Alan E. Battaglia, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for capital murder. Based on the jury's affirmative answers to the special issues of Article 37.071(b), V.A.C.C.P., the trial court assessed punishment at death.

Appellant raises 16 grounds of error. We shall briefly describe the facts shown at the trial. On the evening of May 21, 1977, Mary Kneupper was counting the day's receipts at the Store & Lok storage facility on Interstate Highway 35 and Loop 410 in San Antonio. She operated that business with her husband. Appellant, carrying a .45 caliber pistol, entered her office for the purpose of robbing her, but when she tried to flee the building, appellant vaulted over the counter and shot her once in the head from close range, causing her death. He fled to the car in which his three confederates were waiting, and they left the scene.

In his fourteenth ground of error, appellant contends that Dr. James Grigson, a Dallas psychiatrist, was improperly allowed to testify before the jury at the penalty stage of the trial, over objection, concerning his examination of appellant and his conclusion that appellant would likely commit future criminal acts of violence constituting a continuing threat to society.

Outside the presence of the jury, it was established that in October of 1977, the District Attorney's Office had presented a motion to a district judge, not the judge in whose court the instant case was pending, requesting that Dr. Grigson be appointed to examine appellant to determine the likelihood that appellant would commit future acts of violence.[1] The order was approved but apparently neither the motion nor the order was ever filed in the papers of the cause, nor was a copy ever served on defense counsel until the time of trial in June, 1978. Also, apparently the only written report made by Dr. Grigson was a letter dated November 4, 1977, to the trial judge stating his findings, which letter made its way to the court's file just shortly before appellant's trial. Again, no copy of the letter was ever delivered to appellant's counsel, and apparently their first knowledge of the motion, order and examination came with their discovering the original letter in the court's file.

Prior to Dr. Grigson's testifying, counsel objected that appellant had been denied his Sixth Amendment right to consult with counsel prior to submitting to the examination, that his Fifth Amendment privilege against self-incrimination had been violated, that his state and federal rights to due process had been violated, and that because of the surprise nature of the testimony, his ability to prepare and present rebuttal testimony and to conduct effective cross-examination had been substantially impaired. All of these objections were overruled.

Dr. Grigson subsequently testified that he had met with appellant on two occasions. He found no indications of remorse or guilt feelings, and stated that appellant had no mental disease or defect but did have an antisocial personality. He considered appel-

1. This was apparently done in anticipation of the penalty stage of the impending trial, at which time the jury would be required to answer the special issues in Article 37.071(b):

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

lant to be at the extreme end of the scale of antisocial or sociopathic personality condition. He concluded that appellant would constitute a continuing threat "to whatever society he happens to be in in the future," and that he was extremely dangerous.

Appellant acknowledges that this court has rejected similar contentions in cases such as *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App.1976); *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976), and *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App. 1976). He nevertheless urges that we reconsider our holdings in these and other similar cases, and rule in his favor. For its part, the State relies on the holdings in *Livingston,* supra, and other like cases, that such testimony is admissible notwithstanding the constitutional arguments presented by appellant. Furthermore, the State points to our express refusal in *Muniz v. State,* 573 S.W.2d 792 (Tex.Cr.App.1978), to follow the federal district court ruling in *Smith v. Estelle,* 445 F.Supp. 647 (N.D.Texas 1977), holding to the contrary as a matter of federal constitutional law.

We are constrained to hold, however, that the United States Supreme Court has foreclosed the issue by its opinion in *Estelle v. Smith,* —— U.S. ——, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In that case, a Dallas trial judge on his own motion appointed the same Dr. Grigson to examine the defendant on the issue of competency to stand trial. See Article 46.02, V.A.C.C.P. Dr. Grigson examined the defendant and reported to the court that he was competent to stand trial. The case went to trial with no issue having been raised as to the defendant's competency to stand trial or sanity at the time of the offense. After the defendant was convicted of capital murder, Dr. Grigson was called to testify at the penalty stage that, based on his examination, he considered the defendant a severe sociopath who would commit violent acts in the future "if given the opportunity to do so." The jury subsequently returned affirmative answers to the special issues submitted to them, see Article 37.071(b), V.A.C.C.P., and the trial court assessed the death penalty. This court affirmed in *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App.1976), as admitted in the brief of appellant in the instant case.

Having exhausted his state remedies, Smith filed suit for federal habeas corpus relief and prevailed on contentions identical to those raised at trial by appellant in this cause. *Smith v. Estelle,* 445 F.Supp. 647 (N.D.Texas 1977). The Court of Appeals affirmed. *Smith v. Estelle,* 602 F.2d 694 (5th Cir. 1979). In affirming the lower courts, the Supreme Court held that Smith's death sentence could not stand, given that he had received no warnings regarding his Fifth Amendment privilege against self-incrimination, nor had he been afforded his Sixth Amendment right to counsel, prior to submitting to the examination. Under these circumstances, it was held that Dr. Grigson's testimony concerning his examination, as well as his conclusions regarding Smith's "future dangerousness" derived from the "unwarned" examination, were improperly admitted into evidence.

Here, the contentions raised at trial are identical to those presented in *Smith,* supra. Although we have long held that testimony such as that given by Dr. Grigson is relevant to the jury's consideration of the special issues at the penalty stage, and admissible even over constitutional objection, see, e. g., *Smith,* supra; *Livingston,* supra; *Moore,* supra; *Wilder v. State,* 583 S.W.2d 349 (Tex.Cr.App.1979), vacated and remanded, —— U.S. ——, 101 S.Ct. 3133, 69 L.Ed.2d 987 (1981); *Garcia v. State,* 581 S.W.2d 168 (Tex.Cr.App.1979), vacated and remanded, —— U.S. ——, 101 S.Ct. 3133, 69 L.Ed.2d 988 (1981); *Shippy v. State,* 556 S.W.2d 246 (Tex.Cr.App.1977); and *Von Byrd,* 569 S.W.2d 883 (Tex.Cr.App.1978), the Supreme Court, in its role as ultimate expositor of the United States Constitution, has spoken otherwise, at least as to the constitutional issues.[2] We have no choice, there-

2. In *Smith,* the Supreme Court, quoting language from *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), took pains to make clear that the Texas statutory requirement that the jury assess a capital murder defendant's "future dangerousness," Article

fore, but to sustain appellant's fourteenth ground of error and reverse.

This does not complete our disposition of the case, however. In his third, fourth, and fifth grounds of error, appellant attacks various aspects of the sufficiency of the evidence. Since appellant would be entitled to a judgment of acquittal rather than a new trial should any of these grounds prove meritorious, see *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), we must review these grounds. *Swabado v. State*, 597 S.W.2d 361 (Tex.Cr.App.1980); *Rains v. State*, 604 S.W.2d 118 (Tex.Cr.App.1980).

The great majority of the testimony linking appellant to the robbery-murder of Mrs. Kneupper came from Esther Cervantes and Christie Sparks, whom the trial court was to later characterize in his charge to the jury as accomplice witnesses as a matter of law. Cervantes testified that she had been appellant's girlfriend at the time of the killing in question, and had been with him that day. Appellant had driven his automobile, with Cervantes, Sparks and Fernando Guerrero as passengers, to the Kneuppers' Store & Lok facility. She and the others stayed in the car while appellant went in with a gun. She heard a shot, then appellant came out, got in the car, and drove away at a high rate of speed. On cross-examination, Cervantes related that appellant had told her at the time that the shooting was accidental, and told her that he wished that it hadn't happened.

Christie Sparks testified that she was the girlfriend of Fernando Guerrero at the time of the killing. On the morning of the killing, she was with appellant, Guerrero, and one Jim Rackowitz, and listened while the three men planned to commit a robbery at a savings and loan office at the North Star Mall. Appellant and Guerrero made several telephone calls seeking a gun, but were unsuccessful. They then asked her for a gun, knowing that her stepfather, Major

Albert Jones, Jr., had a military .45 caliber pistol in his bedroom closet. They drove to Jones' house and Sparks went in and got the pistol and a magazine or "clip" filled with seven rounds of ammunition. Then they drove somewhere and parked, and the two men operated the pistol, loading and unloading it. They also discussed their robbery plans, and decided not to include Rackowitz in the robbery.

The three then drove to the savings and loan location at North Star Mall, but found it closed. They then began discussing committing some robberies at some apartment complex offices, since it was rent day and there would be money on hand. They drove to Esther Cervantes' house, and got a pair of sunglasses and a bandana for appellant to disguise his features. Cervantes joined them as they drove around looking for apartment offices. They went to four apartment complexes, but at two the offices were closed and at the other two there were too many people present, so they never completed a robbery.

After borrowing some money from a friend of Sparks', they drove north on IH 35, and appellant stated there was a woman counting some money at the Store & Lok, and that she was alone. Appellant then took the next exit, and they headed toward the storage facility. Appellant and Guerrero argued over which of them would get to do the robbery. They saw a man hitchhiking on the road and Guerrero offered him a ride as a pretense for robbing him, but the man declined. They were then hailed by a San Antonio policeman, who issued appellant a citation for obstructing traffic. With each of these frustrations, appellant appeared to be getting more upset.

After circling the storage facility twice, they parked, and appellant put on the bandana and sunglasses and got the pistol. Sparks lay down in the back seat as appellant went in alone. While he was inside, she heard a shot fired. Appellant jumped into the car shortly thereafter, stating

37.071(b)(2), V.A.C.C.P., is not constitutionally impermissible, nor is psychiatric testimony on the issue constitutionally inappropriate. —

U.S. ——, 101 S.Ct., at 1877–1878, 68 L.Ed.2d 359.

they'd better get out of there, that the gun had gone off and he had accidentally shot the woman. They departed very quickly, and stayed at a friend's house. Appellant later told Sparks that when he went into the office and demanded money, the woman had laughed at him. Then, apparently realizing that appellant was serious, the victim had gotten up to flee out the back door into her apartment. Appellant then jumped over the counter of the office and pursued her to pull her back into the office, and according to his version this is when the pistol went off. Sparks stated that at the time appellant had been intoxicated on "speed" or amphetamines, and also had been drinking beer.

Ronald Ash testified that he had been friends with Guerrero, Sparks and Cervantes and was acquainted with appellant. On the day after the robbery-killing, those three persons came to his home and Guerrero conversed with him. As a result of this conversation, Ash shortly thereafter said to appellant, referring to the robbery and killing, "I heard that you all tried to score and you blew it," to which appellant answered that they had and that they did blow it. Appellant said that they had "done a deal" and that something had gone wrong with it, that he had killed an old lady. Appellant did not cry at saying this, nor did he say that the shooting was accidental.

There was additional evidence from police officers and from the victim's husband that the office area of the storage facility had a high counter across the room, and that the counter had no break or open area in it. In order to have gotten to the other side of the counter, it was established, appellant had to have climbed over it as well as the desk, which directly abutted the counter. In pursuing Mrs. Kneupper, appellant would have had to go directly past the money lying in the open on the desk. Mr. Kneupper testified that he discovered no money missing.

There was additional evidence regarding the .45 caliber pistol and the death wound. It was shown by the testimony of Major Jones, owner of the pistol, that he stored the pistol with all three of its safety mecha-

nisms engaged, with a loaded magazine of seven rounds in the pistol, but with no round in the firing chamber. To fire the weapon, the safety mechanisms would have to be defeated, a round chambered by pulling the slide of the pistol to the rear, and the hammer cocked by the rearward pull of the slide. Both from his testimony and that of firearms examiner Richard Stengel, it was established that the pistol in question could not be fired by accident. Stengel also testified as to having compared shell casings test-fired in Jones' pistol against a casing found at the scene. He concluded from this testing and comparison that Jones' pistol had fired the fatal bullet.

As for the death wound, both Dr. Rudolfo Garza, the physician who performed the autopsy, and officer Stengel testified that there was evidence of powder burns or stippling around the entrance wound on the left side of the victim's neck. Based on test firings with the same weapon and the same type ammunition, Stengel concluded that for the type of stippling pattern he observed to have resulted, the muzzle of the pistol had to have been between three and six inches from contact with the left side of the victim's neck.

■ In analyzing all of these facts, it must be kept clearly in mind that appellant, neither at trial nor on appeal, contested the State's evidence showing that he shot and killed the victim. Rather, he seeks to bind the State to the self-serving statement of appellant, recounted in the testimony of Christie Sparks, that the shooting was accidental. The general rule is that if the State introduces the defendant's statement admitting to acts that would ordinarily constitute an offense, it is bound by any exculpatory assertions therein unless it puts on other evidence to disprove the exculpatory matter. *Palafox v. State*, 608 S.W.2d 177, 181 (Tex.Cr.App.1979), reh. denied 1980. This rule is no less applicable when the statements of the defendant are put before the jury by witnesses for the State who heard them said, as opposed to statements in written form. *Gragg v. State*, 152 Tex. Cr.R. 386, 214 S.W.2d 292 (1948).

■ We conclude that the State sufficiently rebutted appellant's claim of accidental shooting. The disengaging of the safeties on the pistol and the chambering of the round prior to entering the office, the indications that appellant pursued the fleeing victim by climbing over the counter and desk, thus abandoning the unguarded money, the close range at which the pistol was fired, the evidence that it could not have fired accidentally, and the fact that appellant admitted to Ash that he had killed the victim, but so admitted without stating, as he had to Sparks at the time of the shooting, that it was accidental, all constitute circumstantial evidence tending to rebut the exculpatory assertion. Circumstantial evidence, if adequate in quantity and quality, may suffice to rebut exculpatory statements, even without direct evidence. *Gragg,* supra; *Harrison v. State,* 151 Tex. Cr.R. 606, 210 S.W.2d 591 (1948). We therefore find that the State was not bound by the appellant's assertion to Christie Sparks that the shooting was accidental, and that the evidence was otherwise sufficient to justify the jury's verdict as well as the trial court's refusal to direct a verdict of not guilty.

■ Appellant further contends that the evidence was insufficient to support the jury's conclusion that the victim was killed in the course of being robbed by appellant. He argues that there was no corroboration of the testimony of accomplice witnesses Esther Cervantes and Christie Sparks that he was robbing Mrs. Kneupper when he shot her.

Article 38.14, V.A.C.C.P., provides:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

The test for the sufficiency of corroboration is to eliminate the accomplice testimony and then look to see if there is sufficient evidence from other sources to connect the defendant to the crime. *Walker v. State,* 615 S.W.2d 728, 731 (Tex.Cr.App.1981). The other evidence need not independently prove the defendant's guilt, but is sufficient if "... it appears on appeal that before the jury there was proof confirming the testimony of the accomplice to material facts tending to connect the accused with the commission of the offense...." *Minor v. State,* 108 Tex.Cr.R. 1, 299 S.W. 422 (1927).

■ Appellant argues strenuously that the testimony of Ronald Ash was hearsay, dealing only with assertions made to Ash by Guerrero concerning the commission of the offense. Appellant, however, ignores the fact that appellant *himself* made an admission to Ash. After having had a conversation with Guerrero at the time Guerrero, Sparks, and appellant drove to Ash's home, Ash testified that he had asked appellant, "I heard that you all tried to score and you blew it," or words to that effect, and appellant admitted that they had "blown it." Ash later in his testimony rephrased the exchange, saying that he had asked, "What's the matter? You all tried to do a score and you couldn't handle it or what happened?" Ash testified that he had been referring to the robbery and the killing. Appellant had answered that "... they had done a deal and that something had went [sic] wrong with it," elaborating that he (appellant) had killed an old lady. This testimony of appellant's admission to having "tried to score" at the Store & Lok, but that the plans had gone awry and Mrs. Kneupper had been killed, is sufficient standing alone to corroborate the accomplice testimony regarding appellant's having been in the act of robbing the victim when he killed her. We overrule appellant's challenge to the sufficiency of the evidence.

As a result, however, of the reversible error in the trial court's admission, over objection, of the testimony of Dr. Grigson, the judgment is reversed and the cause remanded.[3]

---

3. While we need not and do not reach any of appellant's other grounds of error, due consid-

eration should be given by the trial court, in the

event of a retrial of the case, to the contentions made in the first and second grounds of error

alleging fundamental error in the court's charge at the guilt-innocence stage of the trial.