Ex parte Billy Joe WOODS.

No. 68863.

Court of Criminal Appeals of Texas,
En Banc.

Feb. 17, 1988.

Michael Thornell, Houston, for appellant.

John Holmes, Jr., Dist. Atty. & Susan Spruce, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

OPINION

ONION, Presiding Judge.

This proceeding involves a post-conviction application for a writ of habeas corpus filed pursuant to Article 11.07, V.A.C.C.P. Applicant Woods was convicted of capital murder and the death penalty was imposed.

On appeal his conviction was affirmed. *Woods v. State,* 569 S.W.2d 901 (Tex.Cr. App.1978), cert. denied, 453 U.S. 913, 101 S.Ct. 3145, 69 L.Ed.2d 995.

Relying upon *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), applicant Woods now claims his Fifth, Sixth and Fourteenth Amendments were violated by the introduction of the testimony by a psychiatric witness on the issue of future dangerousness at the penalty stage of his trial for capital murder.

The Supreme Court, in *Estelle v. Smith,* supra, speaking through Chief Justice Burger, held that where prior to the in-custody psychiatric examination ordered by the court to determine the defendant's competency to stand trial the defendant had not been warned that he had the right to remain silent, and that any statement made could be used against him at the sentencing proceeding, admission at the penalty stage of a capital felony trial of a psychiatrist's damaging testimony on the crucial issue of future dangerousness violated the Fifth Amendment privilege against compelled self-incrimination because of a lack of appraisal of rights and a knowing waiver thereof, the death penalty imposed could not stand.

The Court further held that the Sixth Amendment's right to counsel was violated where defense counsel was not notified in advance that the psychiatric examination would encompass the issue of future dangerousness and there was no affirmative waiver of the right to counsel.

It must be remembered that both the Fifth and Sixth Amendments are applicable to the states by virtue of the Fourteenth Amendment. See *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Pointer v. State,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 2d 923 (1965); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972).

In *Estelle v. Smith,* supra, the Dallas County district judge, on his own motion,

appointed Dr. James Grigson to examine the defendant on the issue of his competency to stand trial. See Article 46.02, V.A.C.C.P. Dr. Grigson examined the defendant without giving any warnings regarding his Fifth Amendment privilege against self-incrimination and did not notify the defense counsel that the psychiatric examination would encompass the issue of the defendant's future dangerousness, nor was the defendant accorded the assistance of counsel in determining whether to submit to such examination, etc.

.After the examination, Dr. Grigson reported to the court that Smith (the defendant) was competent to stand trial. The case went to trial with no issue being raised as to the defendant's competency to stand trial or as to the defensive issue of insanity at the time of the alleged offense. After Smith was convicted at the guilt stage of the bifurcated trial of the capital murder, Dr. Grigson was called by the State at the penalty stage of the trial to testify that, based upon his examination, he considered the defendant Smith a severe sociopath who would commit violent acts in the future "if given the opportunity to do so." The jury subsequently returned affirmative answers to the special issues submitted under Article 37.071(b), V.A.C.C.P., and the trial court assessed the death penalty on appeal. The conviction was affirmed by this Court in *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976).

Having exhausted his state remedies, Smith sought federal habeas corpus relief and prevailed on the contentions identical to those raised at trial by this appellant in the instant cause. *Smith v. Estelle*, 445 F.Supp. 647 (N.D. Texas 1977). The Court of Appeals for the Fifth Circuit affirmed though modifying the decision. *Smith v. Estelle*, 602 F.2d 694 (5th Cir.1979). Subsequently the United States Supreme Court affirmed the Fifth Circuit opinion as earlier noted.

In affirming the lower court in the said *Smith* case, the Supreme Court noted that Smith's future dangerousness was a crit-

ical issue at the penalty stage of the capital murder trial, and one upon which the State had the burden of proof beyond a reasonable doubt [See Article 37.071(b) and (c), V.A.C.C.P.]; that the State, to meet its burden, used Smith's own statements unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty.

Thus, the United States Supreme Court held that both the Fifth and Sixth Amendments of the United States Constitution are violated by a doctor's testimony on future dangerousness at the penalty stage of the trial when the opinion is based on questioning of a defendant in custody who is represented by counsel and the questioning is conducted without prior warning on the Fifth Amendment privilege and without opportunity for advice of counsel.

The record in the instant case reflects that on October 16, 1975, after a "hearing" the district court appointed counsel for applicant. On October 21, 1975, a capital murder indictment was returned against applicant. The next day, the State filed a motion for a psychiatric examination by a member of the Harris County Psychiatric Unit. The court on the same date, October 22, 1975, granted such motion and the order was filed among the papers of the cause. The applicant was examined by Dr. Jose G. Garcia on December 16, 1975, and his report was filed with the court on January 15, 1976, finding applicant sane and competent to stand trial. Earlier on January 12, 1976, both of applicant's counsel filed a motion for a court-appointed psychiatrist to determine applicant's competency to stand trial. On January 22, 1976, the court appointed Dr. Gary Byrd as requested and pursuant to said motion.[1]

The trial on the merits did not commence until July 1976. No question of competency or insanity as a defense was raised.

Prior to any testimony at the penalty stage of the trial the applicant made the following objection:

---

**1.** It is not clear from the record whether Dr. Byrd ever examined applicant. His report, if any, is not in the record and he was not called to testify.

"MR. HEACOCK: This will be pertaining to the testimony I believe of a Dr. Garcia, who would be a psychiatrist for the Harris County forensic psychiatric unit. The basis for my objection would be that the examination performed by Dr. Garcia upon the defendant was without the consent or permission of the defense attorneys involved in the case, that the fact that the doctor examined the defendant and elicited from him certain information, even though the Code of Criminal Procedure does not permit the doctor to testify to the discussion he had with the defendant, it does allow the doctor to testify as to the end result of his examination, to wit, his feeling or opinion of the defendant's competency; and also to the proposition of question number two, that is, that there is a probability that the defendant will commit further acts of violence and continue to be a further threat to society. We feel that this indirectly not only shall be used against him as an abridgment of the Fifth Amendment rights, but also will be used for the jury to decide question number two so that his life may be taken. For these reasons, we object to any testimony from Dr. Garcia or forensic psychiatrists or psychologists based on that reason, if it please the court.

"THE COURT: Overruled.

"MR. HEACOCK: Note our exception."

At the penalty stage of trial the State called Dr. Jose Garcia, a psychiatrist, whose qualifications were established. He stated he had examined the applicant. When asked if he determined what mental label to place on the applicant's personality, he answered, "... I did not include a psychiatric label in my report to the court, since I was asked to address myself to the issues of sanity and competency."

"Q  Did you determine whether or not the man was competent, insane?

"A  I did.

"Q  Was he competent?

"A  In my opinion, he was.

"Q  Now, if you will, let me state a hypothetical situation to you and have you give your opinion as to the affect on this defendant, if that hypothetical situation applied to the defendant. Assume that a person in 1970 was convicted of the offense of attempted rape, felony, sentenced to the penitentiary. Subsequently he was released from that penitentiary and then in 1975 at three in the morning, climbed up a porch, up onto a porch on the second floor balcony, kicked in a lady's door forcibly, went inside and completely ransacked, turned everything in the apartment upside down, knocked things over, took the lady's bracelet, pill bottle, carried a television downstairs from her apartment, beat her about the head in such a way that her facial features were obscure to the point of almost not being able to identify the way she looked, tremendous beating, in other words, fractured skull, strangulation, two fractures in the hyoid bone, and then in some manner caused his pubic hair to come in contact with her head while his pants were down and at least he, dressed in no more than his underewear (sic), had his pubic hair touching the lady's head, and the lady was sixty-two years old, invalid, who had to get around on a walker in order to move about, and that he killed this lady by beating her and strangling her and was then caught in the room with her, if that hypothetical situation applied to this defendant, knowing his mental background as you do, can you tell us whether it's more likely than not that this defendant would commit criminal acts of violence that would constitute a continuing threat to society?

"MR. HEACOCK: If it please the court, I have some objections to the question. One, it's not a hypothetical question. Second, there has been no predicate laid at this point for a doctor to answer such a question. I feel it's a vain attempt by the state to get a doctor to answer a question that due to medical probability he cannot answer and I would object to it very strenuously, if it please the court.

"THE COURT: Overruled.

"MR. HEACOCK: Note our exception.

"Q (by Mr. Graham) Can you answer the question?

"A Okay. In relation to the hypothetical question you presented, you describe what sounds as a very aggressive act.

"Q Very aggressive act?

"A Aggressive and violent act in association with a person that has committed similar violent acts in the past. In your final question, would you repeat the final part of the question? Would he be more likely—

"Q Yes, sir. Would he be more likely to commit continued acts of violence that would constitute a continuing threat to society?

"A My answer to that would be yes.

"Q And what is the best method of determining what will happen in the future or what someone will do in the future?

"A Well, we don't really have any methods that's very accurate. In fact, statistical studies on prediction have shown that the prediction of the members of the judicial system is almost, if not more accurate, than the people in the behavioral sciences. That is, we in the psychiatric profession and judges come pretty close to the same level of accuracy.

"Q Well, in your particular medical field, do you use the past to determine the best you can what will happen or what a person will do in the future?

"A We use much attitudinal assessments of a person's personality development; how they interact in society and how they may project of possible behavior, but there are many variables that usually are unforeseen that we cannot even attempt to predict.

"Q Is what someone did in the past the best method you have of determining —I know you are saying you can't say to an absolute certainty what someone is going to do in the future.

"A The things that have occurred in the past are associated with the person at the time of examination, together, is the best tool we have at the present time.

"Q That includes considering what a person did in the past?

"A That is correct.

"Q Is that what helped you to come to your answer a minute ago about a hypothetical situation?

"A True."

On cross-examination Dr. Garcia testified he had examined applicant one time for about thirty or forty-five minutes, and that no psychological tests were administered. With regard to the examination, he was asked:

"Q With the purpose in mind to determine his competency?

"A True."

Dr. Garcia explained that he informed applicant that he had the right to decline to answer questions and that a report of the examination would be made to the court; that no other admonishments were given and he and the applicant were alone at the time of the examination. The record on cross-examination also reflects the following:

"Q By the same token, you can't point at somebody and say 'That man will never change,' can you?

"A There's some people I can.

"Q Did you, for example, in this case?

"A Well, I was not asked that question. The question was would a person in the hypothetical be more likely to commit acts of violence and my answer to that was yes. But if I would be asked to give an opinion with a degree of accuracy greater than that, I cannot answer because I can't predict to that extent."

Other evidence was offered at the penalty stage of the trial.[2]

2. At the penalty stage the State offered evidence of a prior attempted aggravated rape conviction in Louisiana in 1970 for which applicant received a 15 year sentence in the Louisiana State Penitentiary at Angola, Louisiana. The brutal facts of the instant case as described in *Woods*

The 1981 decision in *Estelle v. Smith,* supra, has been held to be retroactive. *Battie v. Estelle,* 655 F.2d 692 (5th Cir. 1981); *White v. Estelle,* 720 F.2d 415 (5th Cir.1983); *Muniz v. Procunier,* 760 F.2d 588 (5th Cir.1985), cert. denied, *McCotter v. Muniz,* 474 U.S. 934, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); *Jones v. McCotter,* 767 F.2d 101 (5th Cir.1985). And this Court has applied the decision retroactively as to both Fifth and Sixth Amendment violations. See, e.g., *Thompson v. State,* 621 S.W.2d 624 (Tex.Cr.App.1981); *Fields v. State,* 627 S.W.2d 714 (Tex.Cr.App.1982); *Ex parte Demouchette,* 633 S.W.2d 879 (Tex.Cr.App.1982); *Ex parte English Ramsey,* 642 S.W.2d 483 (Tex.Cr.App.1982); *Ex parte Chambers,* 688 S.W.2d 483 (Tex.Cr. App.1984).

Applicant's 1976 trial occurred before the 1981 decision of *Estelle v. Smith,* supra, and it has been written, "[w]here a defect of constitutional magnitude has not been established at the time of the trial, the failure of counsel to object does not constitute waiver." *Ex parte Chambers,* 688 S.W.2d, supra, at 486 (Campbell, J., concurring); *Cuevas v. State,* 641 S.W.2d 558, 563 (Tex.Cr.App.1982); *Ex parte Sanders,* 588 S.W.2d 383 (Tex.Cr.App.1979), and cases there cited.

In the instant case applicant's counsel in 1976 expressly objected on the basis of the Fifth Amendment and further objected on the failure to notify applicant's counsel of the examination. Still further, see footnote 12 of *Estelle v. Smith,* supra, adopting the reasoning of the Fifth Circuit Court of Appeals in footnote 19. *Smith v. Estelle,* 602 F.2d 694, 702 (5th Cir.1979), that since "Texas Courts" had interpreted the Fifth and Sixth Amendments to permit such testimony as Dr. Grigson's there was an apparent futility in objecting to an alleged constitutional violation.

There would appear to be no question that applicant can rely upon *Estelle v.*

*v. State,* 569 S.W.2d 901 (Tex.Cr.App.1978), were also before the jury. In answering the special issues at the penalty stage of a capital murder trial under Article 37.071, V.A.C.C.P., the jury may consider all of the admitted evidence at the guilt stage of the trial. *Garcia v. State,* 626

*Smith,* supra, if applicable to the instant case. Further, it does not appear that applicant affirmatively waived his rights or offered any psychiatric or psychological testimony at either the guilt or penalty stages of the trial.

Like *Estelle v. Smith,* supra, there was no issue raised as to the defendant's competency to stand trial or as to the defensive issue of insanity at the time of the alleged offense, and the psychiatrist who had examined the defendant for the purpose of determining competency to stand trial, etc., without giving proper warnings regarding defendant's Fifth Amendment privilege against self-incrimination or notifying defense counsel that the psychiatric examination would encompass the issue of the defendant's future dangerousness, etc., was not called until the penalty stage of the capital murder trial.

In *Estelle v. Smith,* supra, however, Dr. Grigson testified at the penalty stage that based upon his examination of defendant Smith he considered Smith to be a severe sociopath who would commit violent acts in the future "if given the opportunity to do so." In the instant case Dr. Garcia, did not so testify. He was asked a hypothetical question.[3] His response was based upon the hypothetical facts he was asked to assume. Hypothetical testimony alone by a qualified psychiatrist, even one who has not examined the individual, is admissible and in such cases *Estelle v. Smith,* supra, is not ordinarily applicable. *Vanderbilt v. State,* 629 S.W.2d 709 (Tex.Cr.App.1981), cert. denied, 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 179; *Smith v. State,* 683 S.W.2d 393 (Tex.Cr.App.1984); *Holloway v. State,* 691 S.W.2d 608 (Tex.Cr.App.1984); *Hogue v. State,* 711 S.W.2d 9 (Tex.Cr.App.1986), cert. denied —— U.S. ——, 107 S.Ct. 329, 93 L.Ed.2d 301. See *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090

S.W.2d 46 (Tex.Cr.App.1981); *Fierro v. State,* 706 S.W.2d 310, 319 (Tex.Cr.App.1986); *Carter v. State,* 717 S.W.2d 60 (Tex.Cr.App.1986).

3. The question was based on the facts of the case. See and cf. *Woods,* supra.

(1983), reh. den. 464 U.S. 874, 104 S.Ct. 209, 78 L.Ed.2d 185.[4]

We are aware of the decision in *White v. Estelle,* 720 F.2d 415 (5th Cir.1983), where it was held that in a federal habeas corpus proceeding the federal district court was not clearly erroneous in concluding that expert witnesses' answers at Texas penalty hearing to "hypothetical" questions on petitioner's propensity for future violence reasonably indicated that psychiatric prognosis of petitioner's future dangerousness was influenced by and derived from court-appointed pretrial psychiatric examination, thereby violating petitioner's Fifth, Sixth and Fourteenth Amendment rights pursuant to the decision in *Estelle v. Smith,* supra.

In addition to being a federal habeas proceeding to which Fed.R.Civ.P. 52(a)[5] is applicable, *White v. Estelle,* supra, is distinguishable upon the facts. In *White v. Estelle,* supra, each of the expert witnesses testified that based upon their examination it was concluded that White was an antisocial personality. This testimony preceded the "hypotheticals" the answers to which the federal district judge found, in the context of the entire interrogation was influenced by and derived from the court ordered pretrial psychiatric examinations (which one of the witnesses agreed was highly possible).

This was not true in the instant case. Dr. Garcia testified simply, without objection, that he found applicant competent and sane. He was then asked the hypothetical question. That lengthy question near the end did include the phrase "... if that hypothetical situation applied to this defendant, knowing his mental background as you do, can you tell us whether it's more likely than not that this defendant would commit criminal acts of violence that would constitute a continuing threat to society?" Dr. Garcia initially answered only the first part of the question describing the facts as sounding like "as a very aggressive act." He asked that the final part of the question be repeated. The question was then rephrased, "Would he be more likely to commit continued acts of violence that would constitute a continuing threat to society?" Dr. Garcia answered "yes." Dr. Garcia then explained that there were not any methods that were very accurate in determining what will happen in the future, etc. On cross-examination he explained he had not been asked whether the applicant would never change and stated, "The question was would a person in the hypothetical be more likely to commit acts of violence and my answer to that was yes. But if I would be asked to give an opinion with a degree of accuracy greater than that, I cannot answer because I can't predict to that extent." We cannot say, in the context of the entire interrogation of Dr. Garcia including the cross-examination, that the answers to the hypothetical question were influenced by and derived from the court-ordered pretrial psychiatric examination. Dr. Garcia indicated in his responses he was basing his answers upon the hypothetical, not upon the interview with applicant or the applicant's answers to any questions.

The relief prayed for is denied.

CLINTON, J., dissents.

TEAGUE and DUNCAN, JJ., not participating.

---

**4.** In *Barefoot v. Estelle,* supra, it was held that expert testimony, whether in the form of opinion based upon hypothetical questions or otherwise, is commonly admitted as evidence where it might help the fact-finder to do its assigned job, and such opinions ought in general to be deduced from facts that are not disputed, or from facts given in evidence, but may be founded upon statement of facts proved in the case rather than upon personal knowledge, and even in cases involving the death penalty there is no constitutional barrier to applying ordinary rules of evidence governing use of expert testimony including use of hypothetical questions.

**5.** The rule provides in substance that the findings of the federal district judge in habeas corpus proceedings will not be disturbed unless "clearly erroneous."