REVISED, October 27, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT


No. 98-40171


BILLY GEORGE HUGHES

                                        Petitioner-Appellant

                        versus

GARY L. JOHNSON, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION

                                        Respondent-Appellee



        Appeal from the United States District Court
            For the Southern District of Texas


                    October 5, 1999

Before KING, Chief Judge, and HIGGINBOTHAM and DAVIS, Circuit
Judges.

HIGGINBOTHAM, Circuit Judge:


    Twelve years after the crime, a Texas jury convicted Billy

George Hughes of the capital murder of Texas state trooper Mark

Frederick and sentenced him to death.  See Hughes v. State, 897

S.W.2d 285, 288-89 (Tex. Crim. App. 1994).[1]  This was the second

_____

[1]Hughes was initially tried for the murder in 1976 and was sentenced to death;
the conviction and sentence were affirmed on direct appeal.  See id. at 288 n.1;
Hughes v. State, 563 S.W.2d 581 (Tex. Crim. App. 1978).  In 1987, The Texas Court
of Criminal Appeals granted Hughes's state postconviction application and

1

conviction and death sentence for this murder. The jury found Hughes guilty of violating TEX. PENAL CODE ANN. § 19.03(a)(1), which provides that a person commits capital murder if "the person murders a peace officer who is acting in the lawful discharge of an official duty and who the person knows is a peace officer."

I.

A.

On the evening of April 4, 1976, two Texas state troopers pulled over the 1975 Ford LTD Hughes was driving on Interstate 10 near Sealy, Texas. See Hughes, 897 S.W.2d at 289. The troopers were responding to a dispatcher's report that a man driving a similar car had attempted to use a stolen credit card at a nearby motel. See id. After Hughes pulled onto an interstate exit ramp, Trooper Frederick approached the driver's side of the Ford. See id. Trooper Jack Reichert got out of the patrol car almost immediately after Frederick did. See id. Approaching the Ford behind Frederick, Reichert heard a "muffled shot" and saw Frederick "lurch" to the side. Frederick had sustained a fatal wound. As the Ford sped away, Reichert shot several times at the car.

An abandoned car with matching description was found several miles away. The car had many bullet holes, and its trunk contained

_____

reversed Hughes's conviction. See Hughes, 897 S.W.2d at 288 n.1; Ex parte Hughes, 728 S.W.2d 372 (Tex. Crim. App. 1987).

a loaded, sawed-off shotgun and several other weapons. Two days later, a helicopter approached a field where a suspect was reportedly seen. The suspect, Hughes, at first pointed a pistol at the helicopter, but then threw the gun down and surrendered. Ballistics experts identified the pistol as the murder weapon.

The jury convicted, and at the punishment phase answered the three special issues in the affirmative.[2] First, the jury determined that the conduct causing Trooper Frederick's death was committed "deliberately." Id. at 289; see TEX. CODE CRIM. PROC. art. 37.071(b)(1) (West 1981). Trooper Reichert was certain that Frederick had not fired his gun at any time, and there was evidence that the murder weapon had an unusually hard trigger pull. See Hughes, 897 S.W.2d at 290.

Second, the jury determined that there was a probability that Hughes would commit criminal acts of violence that would constitute a continuing threat to society. See id. at 291 & n.8; art. 37.071(b)(2). The evidence offered by the State in support of this second special issue is quickly summarized. There was testimony by Hughes's ex-wife that Hughes beat her many times and that his acts of criminal violence escalated during their marriage; testimony that Hughes was disfellowshipped from his Jehovah's Witness congregation for writing bad checks and lying; testimony that

---

[2]The third special issue asks whether "the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Art. 37.072(b)(3). The application of this provision is not at issue in this case.

3

Hughes threatened to kill a church elder who sat in on the disfellowship proceedings; that Hughes had been convicted for a federal extortion offense in which he made several bomb threats, an offense for which Hughes was on probation at the time of the murder; testimony by an FBI agent who investigated the extortion offense that he believed Hughes would be a continuing violent threat to society; evidence of Hughes's written plans to rob a bank with firearms and the large quantity of guns and ammunition found in Hughes's car trunk; testimony by Hughes's own witness, a prison warden who stated that Hughes was a "con man"; testimony by an assistant prison warden that Hughes was manipulative, dangerous, and violent; testimony that Hughes aimed his pistol at the helicopter just before his surrender.

On direct appeal, Hughes raised 55 points of error. Many of the claims were stated separately under both the Federal and Texas Constitutions. The Texas Court of Criminal Appeals affirmed Hughes's conviction and sentence in 1994, and the United States Supreme Court denied certiorari. See Hughes v. Texas, 897 S.W.2d 285 (Tex. Crim. App. 1994), cert. denied, 514 U.S. 1112 (1995).

Hughes then filed a state action seeking postconviction relief, which the Texas Court of Criminal Appeals denied in February 1997. In September 1997, Hughes, represented by the same attorney who defended him at trial in 1988, filed the instant 28 U.S.C. § 2254 habeas petition with 24 claims spread over a 232-page petition. The district court stayed execution.

The district court in a published opinion granted the State's motion for summary judgment and dismissed Hughes's § 2254 petition. See Hughes v. Johnson, 991 F. Supp. 621 (S.D. Tex. 1998). The court also denied Hughes a certificate of appealability (COA). Hughes timely filed a notice of appeal and applied for a COA in this court with a supporting brief. The State has filed a brief in response.

B.

Hughes filed his federal habeas application in September 1997, after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), and is required to obtain a COA before proceeding with his appeal. A COA will be granted only if Hughes makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2). The issue must be debatable among jurists of reason to proceed further. See Fuller v. Johnson, 114 F.3d 491, 495 (5th Cir.), cert. denied, 118. S. Ct. 399 (1997).

II.

A.

Before proceeding to the substantive claims, we treat Hughes's contention that the standards of review prescribed by the AEDPA are unconstitutional. Wrapping his argument in Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803), Hughes maintains that the standards

5

violate the command of Article III of the Constitution in that they delegate the "final exercise" of the "judicial power of the United States" to decide federal constitutional issues to state court. He argues that this review process "guts the Supremacy Clause" by giving conclusive effect to state court decisions on constitutional questions in an Article III case or controversy. The argument continues that these constitutional questions should be reviewed de novo by federal courts.[3]

We recently rejected the same arguments in a § 2254 appeal filed on behalf of a death row inmate by the same attorney who has filed Hughes's appeal. See Corwin v. Johnson, 150 F.3d 467, 472 (5th Cir. 1998). The appeal "must be reviewed in accordance with this Circuit's interpretations of the AEDPA, as established in Drinkard." Id.

B.

Hughes has not briefed here several claims made below: that the trial court erred in instructing the jury as to the meaning of the words "intentionally" and "knowingly"; that the jury's finding regarding his use of a deadly weapon violated the Ex Post Facto Clause; that the prosecution made several improper jury arguments during the trial's punishment phase; that the trial court improperly denied his motion to suppress evidence seized in

---

[3]Hughes has not argued his substantive claims within the context of the standards of review as modified by the AEDPA.

6

violation of the fourth Amendment; and that the trial court violated his constitutional rights by sustaining the prosecution's challenge of a veniremember for cause. Issues not raised in the brief filed in support of Hughes's COA application are waived. See Moawad v. Anderson, 143 F.3d 942, 945 n.1 (5th Cir. 1998).

## C.

Hughes brings us eleven issues, and we will address each in turn.[4]

---

[4]The issues are as follows:

1. Whether the trial court should have specifically instructed the jury that the term "probability," as used in the context of the second special issue at the penalty phase, meant "more likely than not," and whether this claim was procedurally defaulted.

2. Whether the trial court erred in permitting Dr. John Nottingham, a rebuttal witness for the State, to testify during the penalty phase, allegedly based on a 1976 examination of Hughes conducted without the presence of counsel in violation of Estelle v. Smith, 451 U.S. 454 (1981).

3. Whether the trial court erred in refusing to instruct the jury as to the consequences of its answers to the special issues.

4. Whether the evidence was sufficient to support the jury's answers to the first and second "special issues" at the penalty phase:

    (a) Whether the conduct which caused the death of the victim was committed "deliberately";

    (b) Whether there was a probability that Hughes would commit criminal acts of violence that would constitute a continuing threat to society.

5. Whether the Texas Court of Criminal Appeals erred in refusing to consider mitigating evidence "independently."

6. Whether the jury's reliance on information that was at least 12 years old, with regard to the second special issue, violated Hughes's Eighth Amendment rights.

7. Whether jury instructions at the penalty phase of the trial violated Hughes's constitutional rights under Penry v. Lynaugh,

7

1.

Hughes contends that the trial court erred in refusing to instruct the jury in the second special issue that the word "probability" means "more likely than not" rather than "some probability" or "any probability."

He observes that at the penalty phase, the State called a psychiatrist, Dr. John Nottingham, as a rebuttal witness. Dr. Nottingham had examined Hughes following the offense in 1976 and had concluded that he was legally sane. On cross-examination, Dr. Nottingham testified that he did not know what the Texas legislature meant when it used the word "probability" in drafting the second special issue regarding "future dangerousness," Hughes's counsel having suggested that it meant "more likely than not." Dr. Nottingham declined to "put a number on it." Responding to the

492 U.S. 302 (1989):

    (a) Alleged burden-shifting instruction;

    (b) Use of word "should" rather than "must";

    (c) Trial court's failure to instruct jury on effect of mitigating evidence.

8. Whether jury instructions on the victim's status as a "peace officer" improperly amounted to a directed verdict on an essential element of the offense.

9. Whether the inclusion of irrelevant instructions on causation violated Hughes's constitutional rights.

10. Whether the statutory requirement that 10 or more jurors vote "No" to enter a negative finding on special issues violated Hughes's Eighth and Fourteenth Amendment rights.

11. Whether the prosecution withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).

8

defense counsel, he then added that when he used the term, it means "any probability."

Hughes concedes that a Texas trial court ordinarily is not required to define the word "probability" in the context of the second special issue, but he argues that Dr. Nottingham's "misinterpretation" of the word possibly gave the jury an erroneous view of the law that the trial court was required to correct in its instructions. Hughes also concedes that the Texas Court of Criminal Appeals deemed this claim barred by Hughes's failure to advance a procedurally correct objection to the charge. He maintains that, under TEX. CODE CRIM. P. art. 36.15, no particularized objection is required as long as the defendant offers "special requested instructions" to call the trial court's attention to the alleged error. He asserts that he requested exactly such an instruction.

In rejecting a similar claim by Hughes on direct appeal, the Court of Criminal Appeals determined that Hughes had failed to preserve error on this issue because he "made no objection to the court's refusal to define 'probability' based on Nottingham's allegedly erroneous definition," but he instead objected only that the "term was unconstitutionally vague and that without guidance the jury was left to speculate as to the meaning of the term." See Hughes, 897 S.W.2d at 301-02.

The district court concluded, and the state now argues, that this claim was procedurally defaulted, based on the Texas appellate

9

court's conclusion that Hughes failed to preserve this claim for review. Hughes, 991 F. Supp. at 636.

The procedural default doctrine, resting on our confinement to review of federal questions, precludes federal habeas review when the last reasoned state court opinion addressing a claim explicitly rejects it on a state procedural ground. See Ylst v. Nunnemaker, 501 U.S. 797, 801, 803 (1991). When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice. See Coleman v. Thompson, 501 U.S. 722, 750 (1991). The doctrine presumes that a state procedural ground is adequate and independent – the rule must, for instance, be regularly followed – and, ordinarily, the burden is on the habeas petitioner to demonstrate otherwise. See Sones v. Hargett, 61 F.3d 410, 416-17 (5th Cir. 1995) (citations omitted).[5]

In determining that Hughes had failed to preserve this claim for appeal, the Texas Court of Criminal Appeals relied on a version of Texas's contemporaneous objection rule. See Hughes, 897 S.W.2d at 301-02 ("[A]ppellant's claim on appeal does not comport with his

---

[5]Although federal courts will "presume the adequacy and independence of a state procedural rule when the state court expressly relies on it in deciding not to review a claim for collateral relief, . . . [t]he presumption of adequacy can be rebutted . . . if the state's procedural rule is not strictly or regularly followed." Sones, 61 F.3d at 416 (internal quotation marks and citations omitted). "The Supreme Court has further defined this concept of adequacy . . . to include a state procedural ground that is strictly or regularly applied evenhandedly to the vast majority of similar claims." Amos v. Scott, 61 F.3d 333, 339 (5th Cir. 1995).

objections at trial . . . ."); see also Muniz v. Johnson, 132 F.3d 214, 221 (5th Cir.) (citing TEX. R. APP. P. 52(a) as source of contemporaneous objection rule), cert. denied, 118 S. Ct. 1793 (1998); Sheridan v. State, 950 S.W. 2d 755, 757 (Tex. App. 1997) (citing Rule 52(a) for requirement that complaint on appeal must "comport" with complaint made at trial). We have held that Texas applies its contemporaneous objection rule "strictly and regularly" and that it is an "independent and adequate state-law procedural ground sufficient to bar federal habeas review of federal claims." Amos v. Scott, 61 F.3d 333, 345 (5th Cir. 1995).

Hughes contends that TEX. CODE CRIM. PROC. art. 36.15 required only that he present "special requested instructions" to the trial court and that "no other exception or objection to the court's charge shall be necessary to preserve any error reflected by any special requested instruction which the trial court refuses." But this argument takes the statute too far. This language means only that to preserve an error for an appeal regarding jury instructions, a party who has already requested a certain instruction is not then required to object to the charge actually given by the trial court, after the court has decided to reject the requested instruction. See Vasquez v. State, 919 S.W. 2d 433, 435 & n.4 (Tex. Crim. App. 1996).

Under TEX. R. APP. P. 52(a), a party still must inform the trial court of any "specific defect" in the charge in order to preserve error. See Davis v. State, 905 S.W. 2d 655, 664 (Tex.

11

App. 1995). Under art. 36.15, "[a] defendant preserves error for appellate review if the request is specific enough to put the trial court on notice of an omission or error in the charge." Brazelton v. State, 947 S.W.2d 644, 647 (Tex. App. 1997). It is undisputed that Hughes did not make the argument to the state trial court that Dr. Nottingham's suggestion that "probability" meant "any probability" that Hughes would commit criminal acts of violence created a misimpression that the trial court was required to correct through jury instructions.

In any event, if both we and the courts preceding before us are in error, Hughes's claim lacks merit. As conceded by Hughes, the Texas courts repeatedly have rejected claims that in the penalty phase of a capital murder case the trial court is required to define terms, such as "probability," which are included in the statutory special issues. See Corwin v. State, 870 S.W.2d 23, 36 (Tex. Crim. App. 1993) (en banc). Those courts have held that the failure to define such terms within TEX. CODE CRIM. P. art. 37.071, § (b)(2) does not render them unconstitutionally vague under the Eighth and Fourteenth Amendment. See id. We similarly have rejected contentions that "probability" and other terms included in the statutory special issues are unconstitutionally vague. See Woods v. Johnson, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (and cases cited therein).

Of course, since trial, Hughes has been arguing more than that the trial court's definition of "probability" was

12

unconstitutionally vague; he has maintained that the trial court was required to correct any misperception regarding the meaning of that term that was created by Dr. Nottingham's testimony. "The proper standard for reviewing a challenged jury instruction in the capital sentencing context is 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" Drinkard, 97 F.3d at 757 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)). "This 'reasonable likelihood' standard does not require the petitioner to prove that the jury 'more likely than not' interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than 'only a possibility' of an impermissible interpretation." Id. (citing Boyde, 494 U.S. at 380).

Hughes's contention is that the single reference by Dr. Nottingham to the phrase "any probability" required the trial court to ensure that the jury understood that such term meant "more likely than not." He argues this point, notwithstanding Texas cases holding that its trial courts are not required to define the term "probability." As we put it,

> [t]o the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system . . . . The answer is that such words, often of great consequence, do have a common understanding in the sense that they ultimately mean what the jury says by their verdict they mean.

James v. Collins, 987 F.2d 1116, 1120 (5th Cir. 1993) (quoting

13

<u>Milton v. Procunier</u>, 744 F.2d 1091, 1096 (5th Cir. 1984)).  Given these statements, Hughes cannot say that his proposed definition of "probability" is any more appropriate than the allegedly erroneous interpretation of the term stated by Dr. Nottingham.  Hughes has not made a substantial showing of the denial of a constitutional right as to this claim.

2.

Hughes contends that the trial court erroneously permitted Dr. Nottingham to testify as a rebuttal witness at the penalty phase.  Dr. Nottingham, he urges, used his notes from his examination of Hughes in 1976.  Hughes maintains that the examination in 1976 violated <u>Estelle v. Smith</u>, 451 U.S. 454 (1981), and that Dr. Nottingham's use of that interview was tainted.

On direct appeal, the Texas Court of Criminal Appeals rejected this claim on its merits.  <u>See</u> <u>Hughes</u>, 897 S.W.2d at 302-04.  It explained that the State had conceded that Hughes's 1976 interview was conducted in violation of <u>Smith</u>.  <u>See</u> <u>id</u>. at 302.  Dr. Nottingham had examined Hughes again in 1988 in the presence of Hughes's attorneys; in doing so, he had refreshed his memory with notes taken during the 1976 examination.  <u>See</u> <u>id</u>.

Hughes's attorney asked Dr. Nottingham in a voir dire examination whether he could have recalled inconsistencies between Hughes's answers in 1976 and 1988 without having referred to the 1976 report.  <u>See</u> <u>id</u>. at 302-03.  Dr. Nottingham responded that,

14

but for his 1976 notes, he probably would not have remembered Hughes's stated reason for traveling around the country at the time of the offense.  See id. at 303.

The Texas Court of Criminal Appeals rejected Hughes's Estelle v. Smith contention because "[r]eview of Nottingham's testimony shows that his conclusions were based upon the 1988 interview alone."  Id.  That court found that "[t]here is no indication in the record that [Nottingham's] testimony was influenced by or derived from his earlier examination of [Hughes]."  Id. at 304.

Hughes does not now specifically dispute the Texas appellate court's factual findings and legal conclusion.  In determining that Nottingham's testimony was neither "influenced by or derived from" the earlier interview, the court cited Ex parte Woods, 745 S.W.2d 21, 26 (Tex. Crim. App. 1988), which in turn relied on White v. Estelle, 720 F.2d 415 (5th Cir. 1983).  More recently, this court addressed a habeas appeal by the same state prisoner who had filed the state postconviction application in Ex parte Woods.  See Woods v. Johnson, 75 F.3d 1017 (5th Cir. 1996).  This court rejected the prisoner's Estelle v. Smith claim primarily on the ground that any error was harmless because the psychiatrist's testimony was based on a hypothetical question rather than on the tainted examination of the prisoner, see id. at 1026-33, but it also "agree[d] with the assessment of the state habeas court that '[a] jury could not reasonably construe [the psychiatrist's] testimony . . . as being influenced by or derived from the court-ordered pretrial

15

psychiatric examination of applicant.'" Id. at 1028 (citing Woods, 745 S.W. 2d at 26) (emphasis added). This court concluded in part that the psychiatrist's opinion testimony as to future dangerousness "derived from and related to the acts of violence detailed in the prosecutor's [hypothetical] question . . . , not from [the psychiatrist's] examination of [the prisoner]." Id. at 1029.

A review of Dr. Nottingham's testimony at the penalty phase shows that the prosecutor's questions were tailored to elicit responses about Nottingham's 1988 examination of Hughes. Hughes has not suggested how Nottingham's testimony might have been "influenced by and derived from" his 1976 examination of Hughes.

We are persuaded that the Texas appellate court's conclusion that Nottingham's review of the notes did not influence his testimony was not an "unreasonable application of[] clearly established Federal law[] as determined by the Supreme Court." See 28 U.S.C. § 2254(d)(1). We also reject Hughes suggestion that the "taint" of the earlier examination was incurable; that it created an absolute bar to any expression of opinion by Nottingham.

3.

Hughes contends that the trial court erred in refusing to instruct the jury that, if Hughes were given a life sentence, he would be required to serve at least 20 years in prison without the possibility of parole. Citing Simmons v. South Carolina, 512 U.S.

16

154 (1994), Hughes contends that the Texas statutory prohibition of disclosure to the jury of the consequences of its verdict precluded the jury from rationally determining the consequences of its deliberations. He suggests that the Texas statutory scheme, which shielded information regarding the 20-year mandatory minimum prison term, posed a significant risk that jurors might mistakenly assume that he could potentially have been "paroled immediately" in the absence of a death sentence. Hughes raises a similar issue with respect to the trial court's refusal to instruct the jury with respect to the consequences of its finding on the "so-called 'affirmative finding on use of a deadly weapon' issue," under TEX. CODE CRIM. P. art. 42.12, § 3(g), and art. 42.18, § 8(b). Citing Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985), he suggests that these instructions are unconstitutional because they "do not explicitly require the jury to assume legal and moral responsibility for imposing the death penalty."

At the time of Hughes's trial, TEX. CODE CRIM. P. art. 37.071(g) stated: "The court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the effect of failure of the jury to agree on an issue submitted under this Article." (This provision has since been recodified at art. 37.071, § 2(a) (Supp. 1998).)

In rejecting Hughes's Simmons-type claim on direct appeal, the Court of Criminal Appeals stated, "[t]his Court has repeatedly held that declining to inform the jury of the effect of their answers to

17

the submitted issues does not render article 37.071 unconstitutional." Hughes, 897 S.W.2d at 301. This holding was based on pre-Simmons case law. See id.

In Simmons, the Supreme Court held that a trial court in a South Carolina capital murder case was required to instruct a sentencing jury about the parole implications of a life sentence where future dangerousness is at issue and where the alternative life sentence is without parole eligibility. See Simmons, 512 U.S. at 161-62.

We have repeatedly rejected identical claims based on Simmons. In Allridge v. Scott, 41 F.3d 213, 220-22 (5th Cir. 1994), we distinguished Simmons on the ground that South Carolina law in Simmons made the petitioner legally ineligible for parole, whereas Texas capital defendants who are sentenced to life become eligible for parole after a term of years. See also Muniz, 132 F.3d at 224; Johnson v. Scott, 68 F.3d 106, 111 (5th Cir. 1995); Montoya v. Scott, 65 F.3d 405, 416-17 (5th Cir. 1995). But see Brown v. Texas, 118 S. Ct. 355, 355-57 (1997) (Stevens, J.) (opinion regarding denial of certiorari, indicating that Texas's statutory prohibition of instructing juries about parole eligibility is in "obvious tension" with Simmons). Hughes has not made a substantial showing of the denial of a constitutional right as to his Simmons claim.

Hughes's variation upon this theme rests on Caldwell v. Mississippi, 472 U.S. 320 (1985), under which "it is

18

constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-29. We have observed:

> In Dugger v. Adams, 489 U.S. 401, . . . (1989), the Supreme Court clarified its holding in Caldwell and held that to "establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." Id. at 407 . . . ; accord Sawyer v. Butler, 881 F.2d 1273, 1285 (5th Cir. 1989) (en banc), aff'd, 497 U.S. 227 . . . (1990). In evaluating a Caldwell claim, we look to the "total trial scene," including jury selection, the guilt phase of the trial, and the sentencing hearing, examining both the court's instructions and counsel's arguments to the jury. Id. at 1286-87.

Montoya, 65 F.3d at 420. Hughes concedes that "throughout the voir dire examination, each prospective juror was told of the consequences of affirmative answers to each of the penalty questions," but he suggests that one or more jurors "may well have forgotten" these "preliminary remarks." He argues that the trial court was thus constitutionally required to include a specific instruction regarding the consequences of the jury's answers to the special issues.

In Montoya, a voir dire instruction like the one referred to by Hughes was held to be sufficient to inform the jury of its role under Texas law. See Montoya, 65 F.3d at 421. Moreover, in its closing statement, the prosecution stated

I suggest to you the severity of the punishment should

19

fit the severity of the crime.

Under the law you have only two choices: Life imprisonment or death by lethal injection.

You will determine which of those punishments the defendant should be sentenced to by your answers to three special issues, which probably all of you know by heart now because we went over them individually when you were selected as a juror.

If the jurors had forgotten the instructions on the consequences of their answers to the special issues, these statements reminded them of their role. In his closing statement, Hughes emphasized the jury's responsibility by asking the jury in his opening "not to kill Bill George Hughes." The "total trial scene" makes plain that the jury well knew its role. The Caldwell claim is meritless.

4.

Hughes contends that the evidence was constitutionally insufficient under the standard of Jackson v. Virginia, 443 U.S. 307 (1979), to support "Yes" findings to the first two special issues: (a) that the conduct causing the death of Trooper Frederick was committed deliberately, and (b) that Hughes probably would commit criminal acts of violence that would constitute a continuing threat to society. See TEX. CODE CRIM. P. art. 37.071(b)(1) and (2).

The State contends that claims of insufficient evidence to support the special issues in Texas lack constitutional support. The State argues that, even if the evidence at the penalty stage is

20

to be reviewed by the Jackson standard, a rational trier of fact could have answered "Yes" to both special issues; the State also points out that, on direct appeal, the Court of Criminal Appeals rejected evidentiary challenges on both special issues.

The Court of Criminal Appeals did address and reject Hughes's sufficiency-of-the-evidence challenges on the merits, using the Supreme Court's Jackson standard. See Hughes, 897 S.W.2d at 289-93. The federal district court agreed with the respondent's contention that, "under the circumstances and so long as the sentence is not arbitrary or capricious, no review is required of the jury's answers to the special issues under the teachings of Teague[ v. Lane]." Hughes, 991 F. Supp. at 628. The court noted that under Teague, "federal habeas may not be granted on rules of constitutional law yet to be announced." See id. at n.4. The court did not address whether this court's precedent permitted review of the evidentiary sufficiency of special issues. See id. The court, however, proceeded to address the merits of the claims "in an abundance of caution." Id.

We have on several occasions addressed the merits of challenges to the sufficiency of evidence supporting a jury's answers to special issues at the penalty phase of a death penalty trial. See, e.g., Callins v. Collins, 998 F.2d 269, 276 (5th Cir. 1993); Johnson v. Collins, 964 F.2d 1527, 1530-31 (5th Cir. 1992); Fierro v. Lynaugh, 879 F.2d 1276, 1280 (5th Cir. 1989); Evans v. McCotter, 790 F.2d 1232, 1242-43 (5th Cir. 1985). Assuming but not

21

deciding that we must do so, we will address this claim.

Our standard of review for an insufficient evidence claim in a federal habeas corpus proceeding is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. In applying this standard, a federal habeas court refers to the state's criminal law for the substantive elements of the offense.

(a)  First Special Issue

As for the first special issue, Hughes emphasizes that the term "deliberately" is not functionally equivalent to the terms "intentionally" and "knowingly," which are among the elements of murder under TEX. PENAL CODE §§ 6.03 and 19.02. He asserts that only Trooper Reichert's testimony could conceivably support a finding that he acted "deliberately," but he contends that Reichert's testimony was in fact "utterly inadequate to provide a sufficiently rational evidentiary foundation" for such a finding. Hughes identifies a number of evidentiary inferences that were allegedly assumed by Reichert's testimony and then attempts to show that other trial evidence rendered those inferences either impossible or extremely unlikely.

As we have explained, under the first special issue, "deliberately" is not a term of art and is not defined in the jury instructions. See Johnson, 964 F.2d at 1531. Instead, the term

22

"'is to be taken and understood in its normal use and common language.'" Id. (quoting Carter v. State, 717 S.W.2d 60, 67 (Tex. Crim. App. 1986)). The prosecution need not show that the defendant "'carefully weighed or considered or carefully studied the situation *immediately prior* to killing the deceased in order for the jury to' decide the defendant acted 'deliberately.'" Id. (quoting Carter, 717 S.W.2d at 67). In Webster's Dictionary, "'deliberately' is defined as 'with careful consideration or deliberation; circumspectly; not hastily or rashly; slowly; as a resolution *deliberately* formed.'" Id. For there to be an act of deliberateness, "'there must be the moment of deliberation and determination on the part of the actor to kill. Such determination must necessarily be found from the totality of circumstances in the individual case.'" Id. (citing Cannon v. State, 691 S.W.2d 664, 677 (Tex. Crim. App. 1985)).

The Court of Criminal Appeals concluded that a rational trier of fact could have believed the State's theory of the case and disbelieved Hughes's version of the events. See Hughes, 897 S.W.2d at 290. It found that Hughes, who had been traveling around the country for months, had "numerous reasons to fear being pulled over by DPS troopers," including violating the terms of his probation for the extortion offense by leaving Alabama, driving a stolen rental car, and living off of forged checks and stolen credit cards. Just before the shooting, Hughes had fled a nearby motel after being questioned about a stolen credit card. Finally, the

23

trunk of the car he was driving was full of guns and ammunition.

According to Trooper Reichert, Hughes sat in the car staring straight ahead as Trooper Frederick approached. Reichert testified that just after Frederick turned to face Hughes and just before Frederick fell to the ground, he heard a single muffled gunshot. He was positive that Frederick had not fired his gun at any time. The State's firearms expert testified that an "unusually hard pull" was required to fire the gun Hughes used, which would have taken a deliberate act.

Hughes's testimony was that he fired only after being fired upon first by the troopers, after he reached for his wallet in the glove compartment so that he could retrieve his driver's license. Hughes now calls Trooper Reichert's account "ridiculous, absurd, and inherently incredible." He contends that other evidence suggests that either Reichert or Trooper Frederick "drew his gun and fired one o[r] more shots before Hughes fired." This contention is based primarily on evidence that, after the shooting, Frederick's gun was found in Frederick's hand, and that it was only half-loaded and apparently inoperable. According to Hughes, the record establishes Frederick's "exceptional competence as a law enforcement officer," making it nearly impossible that he would have carried around a half-loaded, inoperable gun for a week before he was shot.

As Hughes concedes, Dr. Joseph Jachimczyk testified that Frederick could have drawn his gun after being shot but before

24

dying. A firearms expert testified that the gun was inoperable, although it could have been made so by striking the ground after Frederick was shot. Reichert testified that Frederick did not fire his pistol and that he did not know whether Frederick *drew* his gun before or after Hughes fired.

Hughes's contention rests largely on the notion that it was nearly impossible for Frederick to be found at the scene and not have fired his gun. This scenario, ably argued, depends almost entirely on the argument that Frederick never would have conducted a highway stop with a half-loaded, inoperable pistol. But this determination was for the jury. Trooper Frederick died of a single bullet that passed through his left arm through his chest cavity where it struck his heart and aorta. He lived ten to fifteen minutes but was quickly down. There was medical testimony that Frederick could have crawled or staggered back the ten feet or so behind Hughes's car where he was found. The jury could have concluded that Trooper Riechert's testimony was credible – that Trooper Frederick was shot standing at the front of Hughes's car door, driver's side, while his left shoulder was turned to the window. The Court of Criminal Appeals did not unreasonably apply the Jackson v. Virginia standard in finding the evidence sufficient to show that Hughes "deliberately" killed Trooper Frederick.

(b)  Second Special Issue

Regarding "future dangerousness," Hughes argues that the

State's evidence was "wholly insufficient to establish the probability of his future dangerousness with the degree of certainty necessary to render the jury's verdict a rational one." He argues that the nature and circumstances of the offense charged did not in themselves establish such "unnecessary infliction of pain and suffering, callousness, or depravity" as to warrant the finding. Hughes maintains that his previous criminal history shows that, except for the three-year period preceding the murder, he has committed "no criminal or other anti-social act whatever," and, even during that three-year period, he engaged only in *threats* of violence. He also asserts that although the State went to great lengths to portray him as a thief, liar, and manipulative "con artist," no demonstrable relationship exists between these traits and the potential for being a violent or dangerous person in the future. Hughes argues that Dr. Nottingham, the State's own witness, could not state with any degree of certainty that Hughes would likely commit criminal acts of violence in the future. He claims that the totality of "credible" evidence "overwhelmingly militates against the imposition of the death penalty."

The Court of Criminal Appeals rejected Hughes's challenge. See Hughes, 897 S.W.2d at 291-93. The court acknowledged that none of Hughes's prior convictions involved physical violence. See id. at 293. The court also noted that the instant offense involved neither "the type of calculated prior planning" nor "facts that were so shockingly brutal or heinous" as to alone support an

26

affirmative finding on this issue.  Id. at 291.  However, the court observed that Hughes's extortion conviction involved threats of violence, that the testimony of Hughes's ex-wife showed that Hughes was "capable of more than threats of violence," and that Hughes's collection of weapons during his string of crimes in the months before the shooting "indicates that [Hughes's] violent tendencies were escalating."  Id. at 293.

Hughes faces a formidable task in establishing that the state appellate court's ruling as to this claim was an unreasonable application of clearly established federal law.  The Texas Court of Criminal Appeals listed considerable evidence:  Hughes's carrying of guns in the trunk of his stolen rental car; his aiming a pistol at the helicopter before his arrest; and his written plans to rob a bank.  See id. at 291-92.  The Court of Criminal Appeals pointed to evidence that Hughes's prior extortion conviction and additional actions involved *threats* of violence, that Hughes's string of crimes in the months preceding the homicide involved a personal accumulation of firearms and ammunition, and that Hughes had in fact engaged in violent acts against his then-wife.  See id. at 293.  It did not unreasonably apply the Jackson standard in concluding that a rational trier of fact could have reached the same conclusion beyond a reasonable doubt.

5.

Relatedly, Hughes contends that the "totality of the evidence

27

in this monumental record overwhelmingly militates against the imposition of the death penalty," even if the State's evidence by itself were "minimally" sufficient to support the jury's affirmative findings with regard to the special issues. Citing Solem v. Helm, 463 U.S. 277 (1983), he maintains that art. 37.071, as applied to him, violates the Eighth Amendment because the death sentence is grossly disproportionate in light of the uncontradicted mitigating evidence.

Hughes also argues that the Court of Criminal Appeals erred in refusing to consider the mitigating evidence "independently," suggesting that the appellate court should have conducted a de novo review of that evidence. He maintains that a state appellate court's limitation of its review in capital cases to the constitutional sufficiency of aggravating factors to support a death sentence, while "totally ignoring" compelling and uncontradicted mitigating evidence, violates his due process rights. Hughes asserts that the Court of Criminal Appeals's refusal to review the mitigating factors independently violated his right to "meaningful appellate review of his death sentence" under the Constitution. He lists several allegedly mitigating factors that the state appellate court refused to consider, focusing mainly upon evidence that, except for the three-year period preceding the killing of Trooper Frederick, his life has been crime-free.

On direct appeal, the Court of Criminal Appeals refused to conduct an independent review of the aggravating and mitigating

28

evidence to determine Hughes's "deathworthiness."  <u>Hughes</u>, 897 S.W.2d at 294.  The court stated that in <u>Pulley v. Harris</u>, 465 U.S. 37 (1984), the Supreme Court held that such review is not required under the Eighth and Fourteenth Amendments.  <u>See</u> <u>id</u>.

(a)  Eighth Amendment Claim

In <u>Harris</u>, the Supreme Court held that a state appellate court was not required to perform a proportionality review by comparing the death sentence before it to death sentences imposed in other cases.  <u>See</u> <u>id</u>. at 43-44, 50-51.

Hughes emphasizes that <u>Harris</u> distinguished between two types of proportionality review.  The first type asks simply whether the death penalty is inherently proportionate "to the [statutory] crime for which it was imposed."  <u>Harris</u>, 465 U.S. at 43 & n.6.  The second type assumes that "the death sentence is not disproportionate to the crime in the traditional sense," but "purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime."  <u>Id</u>. at 43.

Hughes asserts that, during the last nine years, Texas appellate courts have sustained death sentences "on only minimally sufficient aggravating evidence" and will no longer "independently consider a defendant's mitigating evidence at all," whereas the same courts in the late 1970s and early 1980s would focus on a

defendant's "deathworthiness" by weighing the aggravating factors against mitigating factors. Hughes contends that the Court of Criminal Appeals misconstrued <u>Harris</u> in concluding that the Supreme Court did not require such an independent review on direct appeal from a death sentence. He argues that <u>Harris</u> rejected only the notion that a defendant who has been sentenced to death is entitled to a "comparative proportionality review," by which the constitutional propriety of his death sentence would be measured by comparison with other death-penalty cases. Hughes emphasizes that he did not seek such a review on direct appeal.

Inasmuch as Hughes seeks to raise an Eighth Amendment proportionality claim now, it is his own analysis of <u>Harris</u> that is incorrect. He is *not* in fact contending that his death sentence is unconstitutional under the first type of proportionality review (although he implies that this is his argument) because he does not suggest that the death penalty is disproportionate to the statutory offense of the intentional murder of a peace officer in Texas. Instead, he suggests that his death sentence is disproportionate in the circumstances of *his* case because mitigating circumstances should have rendered him ineligible for the death penalty. Implicit in this suggestion is the notion that the death penalty *would* be a proportionate sentence for *other* Texas capital defendants. The claim is barred by <u>Harris</u>, as the state appellate court is *not* required to conduct such a comparative proportionality review.

(b)  Fourth Amendment Claim

Hughes argues that due process requires that he be afforded "independent" appellate review of whether mitigating circumstances undermine his "deathworthiness."  Hughes implicitly acknowledges that no Supreme Court or Fifth Circuit authority expressly requires the "independent" review that he requested from the state appellate court.  In a creative turn, he cites Honda Motor Co., Ltd. v. Oberg, 512 U.S. 415 (1994).  In  Honda, the State of Oregon had constitutional standards limiting punitive damages and restricting their post-verdict review.  See Honda, 512 U.S. at 418.  The Supreme Court concluded that the statute's abrogation of the common-law protection against excessive punitive-damages awards violated due process.  See id. at 430-32.  Hughes contends that the Texas appellate court's refusal to review his death sentence "independently" similarly violates due process.

Hughes's reliance upon Honda is unconvincing.  Of course, "[s]tate capital sentencing procedures must . . . satisfy the requirements of the Due Process Clause of the Fourteenth Amendment."  Williams v. Cain, 125 F.3d 269, 281 (5th Cir. 1997) (citing Clemons v. Mississippi, 494 U.S. 738, 746 (1990)), stay granted, 118 S. Ct. 2338 (Jun. 18, 1998).  When a state provides for the imposition of the death penalty

> in the discretion of the trial jury, . . . the
> defendant's interest in the exercise of that discretion
> is [not] merely a matter of state procedural law.  The

> defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivations by the State.

Id. (quoting Hicks v. Oklahoma, 447 U.S. 343, 346 (1980)) (internal quotation marks omitted).

Some states require independent review of a trial court's imposition of a death sentence, but Texas does not. See Harris, 465 U.S. at 44. We repeat, Texas is a "non-weighing state" in that its capital-sentencing scheme does not direct the appellate court or even the jury to "weigh" aggravating factors against mitigating ones. See James v. Collins, 987 F.2d 1116, 1120 (5th Cir. 1993); Williams, 125 F.3d at 281, 283. In such states, "statutory aggravating factors serve principally to address the concerns of the Eighth Amendment--that is, the role of the statutory aggravators is to narrow and channel the jury's discretion by separating the class of murders eligible for the death penalty from those that are not." Williams, 125 F.3d at 283. For the purpose of initially determining whether a defendant is "death-eligible," the jury need find only a statutory *aggravating* factor. Id. Hughes's contention that he was entitled to an "independent" consideration on direct appeal of mitigating circumstances is not supported by this precedent.

6.

Emphasizing that almost all of the evidence relied upon by the State to support a finding of "future dangerousness" in the second special issue dated from at least 12 years before his 1988 trial, Hughes contends that the "passage of time had made the evidence . . . inherently unreliable" and that the evidence could not provide a "constitutional foundation" to support a death sentence. He relies on Simmons, 512 U.S. 154, for the proposition that the Eighth Amendment requires a "heightened standard" for the reliability of evidence offered in support of a death sentence. Hughes asserts that, at this time, he has not committed a criminal act or engaged in any other "antisocial conduct" in more than 20 years and that he has shown, by his "exemplary public behavior, educational attainments, [and] charitable works," that he does not pose a risk of future danger to society.

First, we are uncertain whether this claim was exhausted, although the district court rejected it on the merits. See Hughes, 991 F. Supp. at 631. Citing Jurek v. Texas, 428 U.S. 262 (1976), the district court in a careful opinion observed that the Supreme Court had approved Texas's death-sentencing scheme by stating that "'all possible relevant information about the individual defendant' should be presented to the decision maker." Id. (citing Jurek, 428 U.S. at 263). The district court observed that the Supreme Court in Simmons *supported* the use of all available evidence, contrary to Hughes's apparent interpretation of that case. See id. (citing Simmons, 512 U.S. at 163). The court emphasized that during the

33

penalty phase Hughes himself presented evidence that was *older* than that he now asserts is "inherently unreliable." <u>Id</u>.

The State replies that no statutory or case authority places an "age limit" on the information that may be considered by a jury in determining whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Hughes is thus asking this court to approve a "new rule" of constitutional law. Regardless, the state's rejection of this claim was not contrary to and did not involve an "unreasonable application of[] clearly established Federal law[] as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

7.

Hughes mounts a three-pronged assault on the trial court's jury instructions at the penalty phase. First, he argues that the court's instruction on mitigation impermissibly shifted the burden of proof to him by requiring that at least 10 jurors credit the mitigating evidence he offered, rather than requiring the jury to find unanimously beyond a reasonable doubt that his mitigating evidence did *not* militate against imposition of the death penalty. Second, Hughes contends that the court erred in instructing the jury that it "should," rather than "must," answer "No" to any of the special issues if it believed that circumstances "mitigated against" the death penalty, which allegedly gave the jury

34

"unlimited" discretion to "disregard" mitigating evidence.  Third, Hughes maintains that the charge failed to apprise the jury of how to "reconcile the mitigation instruction with its obligation to answer the penalty questions factually."  Hughes asserts that the trial court failed to tell the jury what to do if it concluded not only that the evidence mandated affirmative answers to the special issues but also that his "mental, emotional, or psychological state" before and during the shooting constituted a mitigating circumstance warranting only a life sentence.

The State contends that, to mandate these special instructions for anything less than a severe mental impairment, like the one at issue in Penry v. Lynaugh, 492 U.S. 302 (1989), would require the formulation of a "new rule" that would be barred by Teague principles.  In Drinkard, however, the petitioner asserted that special instructions were required to address mitigating evidence that he was intoxicated at the time of the offense.  See Drinkard, 97 F.3d at 756.  This court concluded that granting such relief would not be a "new rule" under Teague because it would constitute an "application of 'a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law.'"  Id. at 757 n.8 (quoting Penry, 492 U.S. at 319).

Hughes's claims here address the following instructions:

2.

The burden of proof in this phase of the trial still

35

rests upon the State and never shifts to the Defendant. Each Special Issue submitted must be proved by the State beyond a reasonable doubt; therefore, before any issue may be answered "Yes," all jurors must be convinced by the evidence beyond a reasonable doubt that the answer to such issues should be "Yes."

. . .

You are further instructed that if any Juror, after considering the evidence and these instructions, has a reasonable doubt as to whether the answer to a Special Issue should be answered "Yes," then such Juror should vote "No" to that Special Issue in the Jury's deliberations.

If ten (10) Jurors or more vote "No" as to any Special Issue, then the answer of the Jury shall be "No" to that issue. . . .

You are further instructed that the Jury may not answer any issue "Yes" unless it agrees unanimously. <u>The Jury may not answer any issue "No" unless then [sic] (10) or more Jurors agree that the answer should be "No."</u>

. . .

5.

You are instructed that you <u>should</u> answer "No" to any of the foregoing Special Issues if at least ten (10) or more jurors find and believe, based upon the evidence presented to you in this case, that the Defendant's character or record or any of the circumstances of the offense mitigate against the imposition of the death penalty in this case. (emphasis by petitioner)

On direct appeal, the Court of Criminal Appeals addressed and rejected Hughes's challenges to these instructions, which were deemed "various <u>Penry</u>-related errors." <u>See</u> <u>Hughes</u>, 897 S.W.2d at 298-300. The court did not address the claims separately as they were set forth by Hughes but generally concluded the court's instructions permitted the jury to consider evidence of Hughes's

36

alleged mental and emotional impairment within the scope of the special issues, as required by <u>Penry</u>. <u>See</u> <u>id</u>. at 299-300.

As emphasized by the district court in disposing of Hughes's challenges to these instructions, the Texas special-issues scheme has been deemed constitutional in the contexts of a wide variety of other constitutional challenges. <u>See</u> <u>Hughes</u>, 991 F. Supp. at 632; <u>see,</u> <u>e.g.</u>, <u>Jurek</u>, 428 U.S. at 275-76; <u>Franklin v. Lynaugh</u>, 487 U.S. 164, 182 (1988) (and citations therein) (noting that the "Texas scheme has continued to pass constitutional muster").

(a)  Alleged Burden-Shifting Instruction

Hughes admits that the trial court instructed the jury at the punishment phase that "[t]he burden of proof in this phase of the trial still rests with the State and never shifts to the Defendant."  He nonetheless argues that another sentence in the instructions shifted the burden back to him:  "The Jury may not answer any issue 'No' unless [ten] (10) or more Jurors agree that the answer should be 'No.'"

At the time of Hughes's 1988 trial, the trial court was statutorily required to instruct the jury that it "may not answer any [special] issue 'no' unless 10 or more jurors agree." <u>See</u> TEX. CODE CRIM. P. art. 37.071(d)(2) (1981);[6] <u>see,</u> <u>e.g.</u>, <u>Cordova v. Johnson</u>, 993 F. Supp. 473, 492 n.93 (W.D. Tex. 1998).

_____

[6]Under 1991 amendments, virtually the same language is retained.  <u>See</u> art. 37.071(d)(2) (West Supp. 1998).

37

We have rejected similar claims. See, e.g., Jacobs v. Scott, 31 F.3d 1319, 1328 (5th Cir. 1994). In Mills v. Maryland, 486 U.S. 367, 384 (1988), the Supreme Court reversed a death sentence under Maryland's capital sentencing scheme whereby an instruction required all 12 jurors to agree on the existence of a particular circumstance before they could consider mitigating evidence. See id. The Court held that this system impermissibly permitted a single juror to block consideration of mitigating evidence and required the jury to assess a death penalty. See id. We have distinguished Mills on the ground that the Texas system permits all jurors to consider any mitigating evidence and does not allow a single juror to preclude the entire jury from considering such evidence. See Jacobs, 31 F.3d at 1329. This court's holding in Jacobs appears to render Hughes's claim meritless.

In any event, we are not persuaded that the challenged instruction "shifts the burden" of proof to the defendant in a capital trial, in that he was required to "persuade" 10 jurors that mitigating evidence required a life sentence. The instructions emphasize that the "burden of proof never shifts to the Defendant" and that unanimous agreement is required to return "Yes" answers to the special issues. Moreover, art. 37.071(e) required the court to sentence the defendant to life imprisonment if the jury was unable to answer any special issue. This provision ensured that anything short of unanimous agreement on the special issues would spare the defendant's life. The claim is meritless.

38

(b) Use of "Should" Rather Than "Must"

Hughes maintains that the instruction that the jury "should" answer "No" to any special issue as to which 10 or more jurors agree gave jurors "virtually unlimited" discretion to reject mitigating evidence.

This argument invokes the "technical parsing" of language against which the Supreme Court has cautioned in the context of reviewing jury instructions. See Johnson, 509 U.S. at 368. If the instruction is analyzed with the "commonsense understanding of the instructions in the light of all that has taken place at the trial," see id., then it is unreasonable to believe that a jury confronted with a life-or-death decision would interpret the trial court's direction as providing a license to ignore evidence and answer "Yes." The Court of Criminal Appeals's rejection of this claim was not an "unreasonable application of[] clearly established Federal law." See 28 U.S.C. § 2254(d)(1).

(c) Failure to Instruct Jury on Effect of Mitigating Evidence

Hughes's third contention here is more akin to a standard Penry claim. He asserts that the jury was never told "what to do" if it determined that the evidence mandated affirmative answers to the three special issues, but also concluded that mitigating evidence compelled a "life-sparing decision." Citing Penry, 492 U.S. at 326, Hughes suggests that the charge failed to provide the

39

jury a "vehicle for expressing the view that [Hughes] did not deserve to be sentenced to death based upon his mitigating evidence" of "mental and emotional problems from 1973 onward."

The trial court instructed the jury to answer "No" to any of the special issues if at least 10 or more jurors determined that, "based upon the evidence . . . the Defendant's character or record or any of the circumstances of the offense mitigate against the imposition of the death penalty in this case."

If Hughes was suffering from a mental or emotional problem when he shot Trooper Frederick, the jury could have given effect to that mitigating evidence in the first special issue addressing whether the shooting was "deliberate." See Lucas, 132 F.3d at 1082 (noting that the jury could have considered mitigating aspect of defendant's psychosis and schizophrenia under first special issue). Hughes did not suggest that he was still suffering from such a problem at the time of the shooting. Rather, he urged that he had been rehabilitated during his twelve years in prison. We thus reject his claim.

8.

Relying on United States v. Gaudin, 515 U.S. 506 (1995), Hughes argues that the trial court violated his constitutional right to have the jury render a verdict on each and every element of the offense, when the court effectively instructed the jury that Mark Frederick was a "peace officer acting in the lawful discharge

40

of an official duty." He maintains that, under TEX. PENAL CODE § 19.03(a)(1), the victim's status as a peace officer acting in the discharge of duty was an essential element of the capital offense with which he was charged. Hughes concedes that the trial evidence was "amply sufficient" to prove that the Trooper Frederick was indeed a peace officer acting in the lawful discharge of an official duty.

In Gaudin, a direct appeal from a federal conviction, the Supreme Court held that "the Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." United States v. Hebert, 131 F.3d 514, 521-22 (5th Cir. 1997) (quoting Gaudin, 515 U.S. at 510-12), cert. denied, 118 S. Ct. 1571 (1998).

Before Gaudin, it was established that a State was required to prove each and every element of an offense charged and to persuade the factfinder beyond a reasonable doubt of the facts necessary to establish each of those elements. See Sullivan v. Louisiana, 508 U.S. 275, 277-79 (1993); see also In re Winship, 397 U.S. 358, 364 (1970). A judge may not direct a verdict of guilty in a criminal case no matter how conclusive the evidence. See Connecticut v. Johnson, 460 U.S. 73, 84 (1983).

The Texas Court of Criminal Appeals did not specifically address this claim, instead focusing on another aspect of Hughes's "peace officer" claim: that Frederick was not in fact acting in his duty as a "peace officer" because the stop of Hughes's car was

41

unlawful.  See Hughes, 897 S.W.2d at 297-98.  The district court did address and reject Hughes's Gaudin claim, concluding that a "fair reading" of the trial court's instructions showed that the "ultimate decision" on whether Frederick was acting as a peace officer lay with the jury.  Hughes, 991 F. Supp. at 633.

Hughes challenges the following portion of the jury charge:

[B]earing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that on or about the 4th day of April, 1976, in Austin County, Texas, the defendant, Billy George Hughes, Jr., did intentionally or knowingly cause the death of Mark A. Frederick, a peace officer acting in the lawful discharge of an official duty, by shooting him with a gun, and the said Billy George Hughes, Jr., then and there knew that the said Mark A. Frederick was a peace officer, then you will find the defendant, Billy George Hughes, Jr., guilty of capital murder as charged in the indictment and so say by your verdict. . . .

(emphasis as added by Hughes)

One of the "foregoing instructions" stated:

Before you can find the defendant guilty of capital murder, you must find from the evidence beyond a reasonable doubt that the defendant intentionally or knowingly caused the death of Mark A. Frederick by shooting him with a firearm, namely, a gun, and at the time of the shooting, if any, the deceased, Mark A. Frederick, was then and there a peace officer acting in the lawful discharge of an official duty, and the defendant then and there knew, at the time of the shooting, if any, that Mark A. Frederick was a peace officer.

If you should have a reasonable doubt as to the existence of any of the foregoing elements, then you cannot find the defendant guilty of capital murder.

(emphasis added)

Thus, the trial court explicitly instructed the jury that, in

42

order to convict Hughes of capital murder, it was required to find that the victim was a "peace officer acting in the lawful discharge of an official duty."

When reviewing a challenged jury instruction under § 2254, the Supreme Court has directed that "'[t]he only question . . . is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Weeks v. Scott, 55 F.3d 1059, 1065 (5th Cir. 1995) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)) (internal quotation omitted). "It is well-established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." McGuire, 502 U.S. at 72 (internal quotation marks omitted). The court is to address whether there is a "reasonable likelihood" that the jury applied the challenged instruction in a "way that violates the Constitution." Id. (internal quotation marks omitted). Viewed against this precedential backdrop, and considering the trial court's explicit instruction regarding the element in question, we conclude that Hughes's complaint regarding the instruction is without merit.

9.

Hughes argues that the trial court's instruction on causation was unconstitutional in that it included an irrelevant and "egregiously prejudicial" incorrect causation instruction when the

43

evidence in his case presented no issue as to whether some cause other than his conduct might have caused the death. Hughes also complains that another section of the instruction permitted the jury to infer that he was guilty of capital murder if he had actually intended only to commit "a different offense" from the one with which he was charged. He cites Beck v. Alabama, 447 U.S. 625 (1980), in support of this claim.

Contrary to what Hughes says, these instructions imply a defendant may be found guilty of capital murder only if he intentionally or knowingly causes the death of another in specified circumstances.

The jury charge contained the following paragraphs:

A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that:

(1) a different offense was committed, or

(2) a different person or property was injured, harmed, or otherwise affected.

(language challenged by Hughes emphasized)

Acknowledging that Hughes had raised his causation-instruction claim under a constitutional rubric, the Court of Criminal Appeals rejected the claim on state-law grounds. See Hughes, 897 S.W.2d at 297. That court determined that the "concurrent causation" charge

44

was erroneous because no real issue of concurrent causation was presented by the evidence. <u>Id</u>. The court reasoned, however, that the error did not require reversal for essentially the same reason: The jury was not authorized to convict on the "theory of causation" because the "abstract paragraph on causation did not apply that theory to the facts of the instant case." <u>Id</u>.

The "concurrent causation" instructions challenged by Hughes were meaningless surplusage. That an instruction is erroneous under state law is not a basis for federal habeas relief. <u>See</u> <u>McGuire</u>, 502 U.S. at 71-72. The controlling question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." <u>Id</u>. at 72 (citation and internal quotation marks omitted). As the Court of Criminal Appeals reasoned, it is highly unlikely that the jury in Hughes's case misapplied the erroneously included instruction, because no factual question of concurrent causation was presented by the trial evidence. <u>See</u> <u>Hughes</u>, 897 S.W.2d at 297. Accordingly, no due process violation could have resulted from the instruction's inclusion in the overall charge.

10.

In an argument that closely tracks themes of his other claims, Hughes maintains that the trial court erred in rejecting his requested verdict form that would have allowed the jury to "implement a life-sparing decision" on the basis of reliance by

45

"any single juror" on "any single mitigating circumstance."  He relies primarily on McKoy v. North Carolina, 494 U.S. 433 (1990), and Mills v. Maryland, 486 U.S. 367 (1988), for the proposition that any death-sentence system that prevents a single juror from effecting such a decision violates the Eighth and Fourteenth Amendments.  Hughes refers to a hypothetical scenario in which nine jurors had concluded that his life should be spared because of mitigating circumstances but would still be unable to effect that decision because the Texas death-sentencing scheme requires at least 10 jurors to agree that the answer to a special issue should be "No."

The Court of Criminal Appeals rejected these same contentions after a thorough discussion of McKoy.  See Hughes, 897 S.W.2d at 300-01.  The court stressed that the death-sentencing scheme at issue in McKoy violated the Constitution because it "prevented the jury from considering any mitigating factor it did not unanimously find."  Id. (emphasis added).  In contrast, the Texas scheme "does not require jurors to agree on the same mitigating evidence."  Id. The "Texas scheme allows a single juror to give effect to mitigating evidence by voting 'no' on any special issue.  The fact that they do not know the effect of their answers does not subject [Hughes] to cruel and unusual punishment."  Id.

We have read McKoy in a similar fashion.  In Jacobs, we observed that "[t]he law in Texas is completely different from that in Mills."  Jacobs, 31 F.3d at 1328.  The system at issue in Mills

46

did not permit the jury to leave the mitigating-circumstances issue blank and proceed to the next issue; only a unanimous decision on the issue of mitigating circumstances could spare a defendant from death row. See Mills, 486 U.S. at 378. Unlike the systems discussed in Mills and McKoy, a single juror in Texas cannot preclude the remainder of the jury from considering mitigating evidence. See Jacobs, 31 F.3d at 1329. As suggested by the Texas appellate court, a juror in a Texas death-penalty case can give effect to mitigating evidence by voting "No" to special-issue questions. The court's disposition of Hughes's McKoy-Mills claim did not involve an unreasonable application of clearly established federal law.

11.

Hughes speculates that the prosecution withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963) and Kyles v. Whitley, 514 U.S. 419 (1995): "If . . . the [Department of Public Safety] conducted an internal investigation of the circumstances surrounding Officer Frederick's shooting that uncovered facts inconsistent with, or directly contrary to, the version of events set forth in Officer Reichert's statement, those undisclosed facts amount to a Brady-Kyles violation" (emphasis added). He asserts that the district court erred by denying his request for an evidentiary hearing on this matter.

A defendant's right to due process is violated when, upon a

47

request for exculpatory evidence, the government conceals evidence that is both favorable to the defendant and material to the defendant's guilt or punishment. See Brady, 373 U.S. at 87-88. Exculpatory evidence as well as impeachment evidence falls under the Brady rule. See Giglio v. United States, 405 U.S. 150, 154 (1972). Evidence is material when a reasonable probability exists that its disclosure would have caused a different outcome at trial. United States v. Bagley, 473 U.S. 667, 674-75 (1985). If the nondisclosure could put the case in a completely different light so as to undermine confidence in the outcome of the proceeding, the defendant will have demonstrated the reasonable probability necessary under this test. See Kyles, 514 U.S. at 434. Materiality is judged according to the cumulative effect of all the undisclosed evidence. See id. at 436.

Hughes's conclusionary Brady claim is purely speculative. His allegations on this matter reflect that he has no idea whether there even was an internal investigation, much less whether such an investigation revealed exculpatory facts. Such speculation does not support a Brady claim. See United States v. Pretel, 939 F.2d 233, 240 (5th Cir. 1991).

Nor is Hughes entitled to an evidentiary hearing. "When there is a factual dispute, [that,] if resolved in the petitioner's favor, would entitle [him] to relief and the state has not afforded the petitioner a full and fair evidentiary hearing, a federal habeas corpus petitioner is entitled to discovery and an

48

evidentiary hearing." <u>Goodwin v. Johnson</u>, 132 F.3d 162, 178 (5th Cir. 1998). Hughes's conclusory allegations, however, are not sufficient to require an evidentiary hearing. <u>See</u> <u>Harris v. Johnson</u>, 81 F.3d 535, 540 (5th Cir. 1996).

In conclusion, we acknowledge Hughes's able counsel's thorough, exhaustive, and creative effort, but we are unpersuaded that a Certificate of Appealability should issue on any of Hughes's claims.

DENIED.